THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM L. KILZER, Defendant-Appellant.

Fifth District   No. 77-53

Opinion filed May 1, 1978.

Ralph Ruebner, of State Appellate Defender's Office, of Chicago, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

William L. Kilzer was convicted of rape in a jury trial in the Circuit Court of St. Clair County and sentenced to a penitentiary term of 8 to 24 years. On appeal he assigns as error several allegedly improper remarks by the prosecutor at trial and the severity of his sentence.

Defendant was charged with raping, in her home, a 13-year-old girl, described as mentally retarded, who is physically handicapped. The girl's mother, Dorothy McCombs, testified that between 10 and 11 o'clock on the morning of August 21, 1976, she left her Alorton home to work in her garden a mile and a half away; remaining at home were her daughter, Maxine Cole, and her 10-year-old son, LeBrant Crawford. While gardening, she noticed a man, whom she later identified as the defendant, drive up and park behind her car. During their conversation the man told her his name was Bill, he worked at McDonnell Aircraft, he had in his car a container of nerve pills for his 84-year-old mother, he was not married, he had just purchased some snow tires for $35, he lived in Belleville with his mother and he was on his way to Lake Drive in East St. Louis. She pointed in the direction of her home during the conversation and told him

her name. The next time she saw Maxine was when the police took her to the hospital and Maxine was there holding two dollar bills.

LeBrant Crawford testified that he began mowing the lawn soon after his mother left home that morning. He said that a man, who was somewhat fat, wearing a white T-shirt and beige pants, drove up in a beige or white car and asked where LeBrant's mother was. Upon being told that she was not at home, the man said something about a job in a bar. LeBrant remembered having written a telephone number on a paper bag earlier that morning with regard to a man calling about a job in a bar. As the boy resumed cutting the grass he noticed the man leaning against a pillar on the front porch. When he turned around later the man had disappeared.

LeBrant testified that he entered the house and saw the man standing over his sister. When the man saw LeBrant, he turned around and zipped up his pants. Upon his sister's request to get the man out of the house, LeBrant turned to call the police but dropped the phone when the man said not to call. As the man left in his car, LeBrant wrote on a paper bag the car's license number as DRB 18 and DR 9518. The boy then called the police. LeBrant identified the defendant as the man who came to his home that day. The parties stipulated that defendant owned a cream color 1965 Plymouth with license number DR 9518 at that time. Upon the suggestion that the letters the boy saw might actually have been "BR", the State called Leroy Kuhl of LaGrange Park who testified that he owned the car, a black 1975 Thunderbird, with Illinois license plate number BR 9518 but that he was not in St. Clair County on that date. On cross-examination LeBrant's testimony was impeached regarding whether the man was standing over Maxine or whether they were both standing beside the bed when the boy entered the room.

Maxine Cole testified that soon after she had taken a bath, a man came into the house and asked for the telephone. He then asked her if she wanted to make $2 and she refused. He threw her on her brother's bed, unzipped his pants, got on top of her, and forced her to have intercourse. He then gave her two dollar bills. After the man had gotten up, LeBrant came into the house. She identified defendant as the man.

On cross-examination, she stated that she was not positive in her identification and that her testimony had been directed by others. She stated that prior to trial she, Dorothy McCombs, and LeBrant had jointly rehearsed their testimonies with the prosecutor. She admitted that she had lied during direct examination when she had stated that it was she who had called the police. When shown her three-page statement to the police, she said, "This is what they made up." Although she had signed the police report, Maxine admitted that she could not read it. She could not recall the man removing his pants, what she was doing while the man was on top of her, how soon after her mother left that the man arrived, or

generally when the incident occurred. She said the man was dressed in a white T-shirt and blue jeans. She also testified, during cross-examination, that the man was pulling up his pants when LeBrant entered the room; the police report reflects that in her original statement she said that the man was still lying on top of her when LeBrant appeared. Also on cross-examination, she remembered that when she was taken to the hospital after the incident, she told the nurse that she had been raped at about 10:30 a.m., while she testified on direct examination, because other people told her, that it happened around noon.

On redirect examination, Maxine stated that when the prosecutors went over her testimony with her prior to trial, they cautioned her to tell the truth. The following colloquy then occurred between the State's attorney and the witness:

> "Q: Now, what I want you to do is to tell the truth. I'm going to ask you again, you have testified when I asked you on direct examination that you were positive that Mr. Kilzer was the man that was in your home.
> A. Yes, sir.
> Q: On cross-examination you have testified that you don't remember whether he's the man. Now, what I want is the truth. I'm going to ask you, was Mr. Kilzer in your home on August 21, 1976, doing the things that you have testified happened to you?
> A: (Pause)
> Q: Do you understand the question, Maxine?
> A: Yes, sir.
> Q: Do you remember what happened—
> MR. STURGEON: Your Honor, I would like an answer to the question that was given.
> MR. KUEHN: I'll withdraw the question.
> MR. STURGEON: I would like to show that before it was withdrawn there was a long pause of approximately twenty-five seconds.
> THE COURT: The records will so reflect."

Maxine then again identified the defendant as the man who came to her home.

Dr. Robert Flow, the emergency room physician at the hospital to which Maxine was taken, testified that his opinion was that the girl had suffered recent trauma to the vaginal area. The doctor did not have an opinion with a reasonable degree of medical certainty whether Maxine Cole had had sexual intercourse on that day. A vaginal smear test did not show the presence of sperm in her vagina.

The defendant testified that he purchased snow tires in East St. Louis that Saturday morning and had them installed. He said he left the service

station at approximately 10:35 and went directly home, arriving around 11:00. He was married and lived in Belleville. He did not return to East St. Louis that day. He stated that he had never seen Maxine Cole before seeing her in the courtroom. He testified that he had met Dorothy McCombs and LeBrant the Thursday evening before the Saturday morning in question. Her vegetable garden bore a sign announcing okra and squash for sale and he stopped to buy some vegetables. At her request he had told her his name and that he lived in Belleville. She had said her name was Dorothy the vegetable lady.

The defendant testified that McCombs had asked him several questions—whether there was any man who would help her pay for gas and electricity that would be installed in her vegetable stand, whether he was married, whether he had any children, whether he knew of a house trailer for sale, where he worked, and whether he was coming back there again. When he replied that he was coming to the area on Saturday morning to pick up his snow tires, she asked him to return to the stand that day at 10 a.m. He agreed, and as he drove away he saw her remove her purse from her car and write something down while looking at the back of his car.

He stated that as it was after 10:30 on Saturday when the tires were installed, he did not return to the vegetable garden but went directly home. He had never been at McCombs' residence but had once been in the yard. He denied raping Maxine Cole.

Next, Phyllis Musetti, a registered nurse, testified that she was working at the Centerville Hospital emergency room the day Maxine Cole was examined. She said that Maxine had reported to her that the incident occurred at 10:30. On cross-examination the prosecutor asserted that Nurse Musetti's report was not the complete report and that defense counsel had removed some sheets from the nurse's report. He then showed her some additional pages of which he stated defense counsel had copies. Nurse Musetti testified, "This is the rape report that we fill out, but I don't fill these out." She said, however, that she was present when the rape report was complete. The prosecutor then asked if the rape report showed a time of 11:20 given. Defense counsel objected and the trial court sustained the objection. When asked if Maxine Cole gave the "night time [sic]," the nurse replied that she was present when the report was filled out but that it was too long ago to remember independently. Nurse Musetti's interview with Maxine occurred at approximately 1 p.m.

Dennis Aubuchon, a serology analyst, testified that the sheet from the bed on which the rape allegedly occurred contained no seminal fluid. He also stated that a sample of defendant's hair was dissimilar from hair found on the bed sheet but he could not conclude that the hairs were not from the same source.

A stipulation was then read that Dr. Frank Holman, a pathologist at Centerville Hospital, examined a vaginal smear taken from Maxine Cole at approximately 1:30 p.m. on August 21, 1976, and that "no spermatozoa were seen."

On rebuttal, the State's attorney asked Richard Kruse, an Illinois State police detective, whether, on the evening of the incident he had informed defendant of the progress of the investigation and that his car and license number were reportedly seen at the McCombs house that morning. Detective Kruse stated that he had done so at the Belleville Police Station, although he had not mentioned it in his report. LeBrant Crawford was recalled and testified that although he sometimes assisted his mother in her garden, he had never seen defendant there.

The jury found the defendant guilty of rape and taking indecent liberties with a child, but the trial court entered judgment only on the rape verdict. Noting that a crippled young girl had been raped in her own home, the trial court found that the rape was aggravated and did not impose the minimum sentence.

Defendant's primary argument on appeal is that the prosecutor caused a prejudicial error by referring in his closing argument to matters not in evidence in an attempt to impeach the defendant's testimony. The argument was as follows:

"MR. KUEHN: * * *

What about the defendant? What about his testimony in the case? Today he tells the story to you that has never been told before.

MR. STURGEON: I object to that, Your Honor. To clarify that, the defendant gave a statement and that statement corroborates with the defendant's testimony today.

THE COURT: Sustained.

MR. KUEHN: The defendant was confronted by the police. They had a license plate number of a car leaving the scene. They went to him. They explained to him what they had. Here is our evidence. The young boy has seen your car and your license plate number leaving the scene of this crime. They tell him that before he makes a statement. Don't you think at that point in time that if he was going to have a story about seeing the mother in Alorton just two days before and seeing the mother and talking to her and her writing something down as he is looking through the rear-view mirror, don't you think he would tell the police that? No, he didn't tell them that."

The defendant testified that when the police questioned him, they did not tell him that the boy had reported the license plate number of defendant's car. However, Detective Kruse stated that he had informed

the defendant of this fact at the Belleville police station prior to the time the defendant made a written statement but that he, Kruse, had not included that part of the conversation in his report. Although a motion to suppress the statement was denied, the statement was not introduced into evidence and its contents were not revealed, nor did officer Kruse testify to the substance of defendant's written or oral statement.

Defendant urges us to decide this issue under *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), which holds that it is a violation of due process to cross-examine an accused about his post-arrest silence and to mention that silence in a closing jury argument. The rationale of *Doyle* is that the silence of a defendant who has been specifically advised under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), of his right to be silent is inherently ambiguous and thus not probative of substantive issues. The defendant notes that although a written statement was given to the police, there is no evidence that the statement contradicts defendant's testimony at trial. Thus, the defendant asserts that it was improper both for the prosecutor to attempt to use the defendant's partial silence for impeachment and to argue to the jury matters not in evidence.

In *Doyle* the prosecutor cross-examined a defendant, who offered exculpatory testimony at trial, about his post-arrest silence in order to raise, and then to argue to the jury, an inference that that silence was a prior inconsistent statement. (See also *United States v. Hale*, 422 U.S. 171, 45 L. Ed. 2d 99, 95 S. Ct. 2133 (1975).) We find it unnecessary, however, to determine whether the rule of *Doyle* should be extended to partial silence, and we therefore decline to do so. In the present case the evidence does not even raise the inference, permissible or not, of an inconsistency. Rather, the prosecutor argued the content of the defendant's written statement whose contents had not been disclosed.

■■ Statements of fact not based upon the evidence may not properly be argued before a jury. (*People v. Beier*, 29 Ill. 2d 511, 517, 194 N.E.2d 280, 283 (1963).) Improper remarks during closing argument deny a defendant a fair trial and constitute reversible error when they result in substantial prejudice (*People v. Nilsson*, 44 Ill. 2d 244, 248, 255 N.E.2d 432, 434 (1970), *cert. denied*, 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881 (1970)) and, thus, operate as a material factor in the conviction. The reviewing court must determine whether the verdict could have been otherwise if the objectionable remarks had not been made. (*People v. Davis*, 46 Ill. 2d 554, 560, 264 N.E.2d 140, 143 (1970); *People v. Patterson*, 44 Ill. App. 3d 894, 900, 358 N.E.2d 1164, 1169 (1st Dist. 1976).)

In light of the conflicting evidence in this case, we believe that the verdict might in fact have been otherwise had these remarks not been made. Also, the remarks of the prosecutor about defendant's statement to

the police could have created the impression that an incriminating statement had been suppressed. A similar situation existed in *People v. Patterson,* 44 Ill. App. 3d 894, 358 N.E.2d 1164 (1st Dist. 1976), in which the evidence showed that following his arrest Patterson had had a conversation about the robbery with a policeman, but the content of the conversation was not disclosed. Although it was objected to and struck from jury consideration, the prosecutor's argument that the reason the police had not checked the defendant's alibi was because the defendant had never mentioned it before trial, was described by the court as "outside the record, inflammatory and wholly unwarranted." (44 Ill. App. 3d 894, 897, 358 N.E.2d 1164, 1167.) While the *Patterson* court would not have reversed that defendant's conviction for this error alone,[1] we believe that remarks such as these cannot be cured by instructing the jury to disregard them.

Inasmuch as this case must be reversed, it is unnecessary to address most of defendant's other assignments of error. We wish to note, however, that the prosecutor's implication, during his cross-examination of Nurse Musetti, that defense counsel had edited the hospital report, was improper. This should be avoided at retrial.

For the foregoing reasons, the judgment of the Circuit Court of St. Clair County is reversed and remanded for a new trial consistent with this opinion.

Reversed and remanded.

EBERSPACHER, P. J., and G. J. MORAN, J., concur.

---

[1] The *Patterson* court also remarked that whether such evidence itself would be constitutionally permissible in that case depended on several facts, not present in the record, such as the substance of defendant's conversations with the police and whether *Miranda* warnings had actually been given. (44 Ill. App. 3d 894, 898, 358 N.E.2d 1164, 1167.) It is a possible inference that the giving of *Miranda* warnings is a prerequisite for a case to come within the scope of *Doyle.* Nevertheless, we do not believe that the right of silence of a person questioned by the police, whether arrested or not, depends for its existence on his having been informed of that right.