THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES "CHUCK" MILLER, Defendant-Appellant.

Fourth District    No. 16469

Opinion filed March 3, 1982.

Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Tim P. Olsen, State's Attorney, of Jacksonville (Robert J. Biderman and Garry W. Bryan, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:

The State's Attorney asked a single, fatal question of the defendant on cross-examination.

The query was in direct violation of the United States Supreme Court's edict in *Doyle v. Ohio.*

Because of it, we must reverse and remand for a new trial.

## FACTS

Miller, Clarence "Butch" Armstrong, and Randy Williams were charged with abducting, beating, robbing, and killing Neil Gorsuch.

Armstrong's case was tried separately. Williams pleaded guilty to kidnapping and the other charges against him were dropped when he agreed to testify against Miller and Armstrong.

Upon denial of Miller's motion for change of venue, a jury trial was held in Morgan County. The prosecution's case against Miller consisted mainly of the testimony of Randy Williams. At Miller's trial, Williams testified substantially as follows:

At 1:30 a.m. on February 9, 1980, Williams, his brother Rick, "Butch" Armstrong, and a person later identified as the victim left a tavern in Jacksonville, Illinois. The four got into a car belonging to a friend of Rick Williams. Rick drove to his house and got out. Randy began driving with the victim sitting behind him and Armstrong sitting in the back seat next to the victim. During this trip, Armstrong administered a beating to the victim.

After driving around for an undetermined length of time, the trio arrived at Williams' house. Once inside, it was discovered that the victim had become incontinent. While the victim was in the bathroom cleaning himself, Armstrong obtained from Williams a .12-gauge shotgun, shells, and a .32-caliber pistol containing one shell. When the victim exited the bathroom, Armstrong, finding feces on the floor, struck and knocked Gorsuch down. Williams attempted to clean up the feces and blood, but was not completely successful. Thereafter, the trio prepared to leave. Armstrong placed both guns in the car, shoved the victim into the rear seat, and then got in the passenger side of the car. Williams began driving and at some point, Armstrong fired the .32-caliber pistol into the back seat of the car, ostensibly to convince the victim to keep his head down. During this time, the victim's face was covered with a stocking cap.

Subsequently, with Armstrong giving directions, Williams drove to a trailer court. According to Williams, it was still dark at this time. Armstrong got out and went to a trailer, but returned shortly thereafter. Miller followed a few minutes later and got into the back seat of the car with the victim. Williams again began to drive, with Armstrong and Miller giving directions. Miller asked the victim if he had any money. According to Williams, the victim replied affirmatively, whereupon Miller hit the victim and demanded all of his money. Williams testified that he then heard Miller going through the victim's pockets.

Williams testified that he drove west out of Jacksonville through the country until he came to a bridge, where Armstrong ordered him to stop. Miller was the first to exit the car. Armstrong followed, and handed Miller the shotgun. Williams was the next to get out. Armstrong then took the

victim by the arm, pulled him out of the back seat of the car, and shoved him up against the rail of the bridge. Williams testified that Miller then shot the victim in the head. According to Williams, Armstrong took the shotgun, reloaded it, and also shot the victim in the head. Armstrong put a third shell in the shotgun and gave it to Williams. When Williams shot and missed, Armstrong ordered Williams to shoot again and to do it right this time or be buried there with the victim. As the shotgun was reloaded for this fourth shot, the empty shell fell through the floor of the bridge. Williams testified that he thought he hit the man with his second shot.

Armstrong then grabbed the body of the victim by the feet and flipped it over the north side of the bridge. On Armstrong's orders, Williams picked up the spent shells—except the one which fell through the bridge. Armstrong, Miller, and Williams got into the front seat of the car, with Williams again driving. According to Williams, it was still dark when the trio left the bridge, heading west. A short while later, the shells, along with the victim's wallet and driver's license, were thrown out the passenger side of the car. The three returned to Williams' house, where they disposed of the shotgun. While it was still dark, Williams and Miller took Armstrong home and proceeded to a cafe. It was beginning to get light out when they arrived at the cafe. Later, Williams took Miller home.

That afternoon, Miller, Williams, and Armstrong met at another tavern in Jacksonville. All of them then went to Williams' house, where Williams cleaned up the house and the car used in the murder. The three returned to the tavern. Armstrong later left, but Williams and Miller were soon joined by Williams' brother, Rick. Williams informed his brother, Rick, that he was in trouble and needed to talk. After some more drinking, Miller, the Williams brothers, and Chris Peterson went to Williams' house. Williams testified that he and Rick went into a bedroom, where he told brother Rick that "they" had killed the person who was with them the previous evening. Thereafter—according to both brothers' testimony—Miller entered the bedroom and admitted the killing. Miller and Williams then left for another bacchanalian evening. They were arrested together the next morning.

Williams' testimony was challenged in several respects on cross-examination. Williams admitted to lying to the police about what he had told his brother the day after the murder and was unable to give details of the conversation between Miller, Rick, and himself when Miller allegedly admitted the murder. It was also brought out that the day after the offense, Williams told the police that Armstrong had fired the .32-caliber pistol into the rear seat while on the way to the bridge where the victim's body was found, and not before picking up defendant, as Williams had testified at trial. Additionally, Williams admitted that he had been

drinking since 1:30 p.m. on the date of the offense; could not recount exactly where he had driven on the night of the murder; and was unable to say how much time elapsed between the events leading up to the murder.

Finally, an expert witness for the defendant testified that in his opinion, the victim was not shot at the bridge where his body was found. On cross-examination, however, the witness stated that his opinion was based on the belief that the victim's body could not have hung over the railing of the bridge after the shooting, but that he had never examined either the bridge or the body of the deceased.

Despite these infirmities, there was some corroboration for Williams' testimony. Several persons confirmed that Armstrong and the Williams brothers left the tavern with the victim. Chris Peterson confirmed the testimony that Rick was dropped off at his house soon after leaving the tavern. Although they were unable to give exact times, several witnesses testified that in the early morning hours of February 9, 1980, Butch Armstrong came to a trailer and spoke briefly with Miller, and that Miller, left with Armstrong and did not return until after daylight. In addition, Randy Williams' mother testified that Miller and her son arrived at her cafe for breakfast about 6:15 a.m. on the day in question. It was stipulated that the sun rose at 6:59 a.m. on that day. The pathologist for the State testified that after performing an autopsy on the victim, he determined that the cause of death was either of two shotgun wounds to the head. Other scientific and physical evidence tended to corroborate Williams' testimony.

Miller testified in his own behalf that it was nearly daylight when Armstrong and Williams came to the trailer to see him. He stated that the pair told him that Williams had beaten the victim with a pair of "numchucks" and that the victim had been shot to prevent him from going to the police. Miller contended that Armstrong and Williams only came to him for advice *after* they had committed the murder.

## Opinion

The following colloquy took place at Miller's trial between Miller and the State's Attorney, Edwin Parkinson:

"Q. Mr. Miller, how old are you?

A. Twenty-three.

Q. Why didn't you tell this story to anyone when you got arrested?"

An objection to the last question was sustained and the jury was instructed to disregard, but a motion for mistrial was denied. Defendant contends that this examination violated his fifth and fourteenth amendment rights to due process of law.

The clear directive issued by the Supreme Court in *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, and *United States v. Hale* (1975), 422 U.S. 171, 45 L. Ed. 2d 99, 95 S. Ct. 2133, is that prosecutors may not comment upon—nor question defendants regarding—post-arrest silence. To do so is fundamentally unfair as silence is "insoluably ambiguous" and may constitute simply the exercise of the constitutional right to remain silent. The prosecutor's comments here clearly violate this directive, and the State does not seriously contend otherwise. Rather, the State contends that any error which did occur was harmless.

In neither *Doyle* nor *Hale* was the Supreme Court faced with the question of the applicability of the harmless-error doctrine. However, in *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, the court held that even constitutional errors may be harmless if it is clear beyond a reasonable doubt that the error did not contribute to the defendant's conviction. Additionally, our own supreme court has applied the harmless-error doctrine in a case involving a *Doyle* violation. *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.

However, while the harmless-error doctrine may be applied to errors of this type, the *Chapman* standard was not met here. While the evidence in this case was sufficient to prove Miller's guilt beyond a reasonable doubt (see *People v. Wollenberg* (1967), 37 Ill. 2d 480, 229 N.E.2d 490; *People v. Sheridan* (1977), 51 Ill. App. 3d 963, 367 N.E.2d 422), it was not so overwhelming as to preclude all reasonable doubts about the effect of the prosecutor's comment. As previously noted, there is corroboration for the testimony of the accomplice, Randy Williams. However, nothing except Williams' testimony directly links Miller with the crimes.

We are cognizant that the jury was instructed to disregard the prosecutor's comment and that a prompt instruction will usually cure an error at trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) As *Carlson* recognized, there are exceptions to this rule. It seems that no decision of the courts in this State has dealt precisely with the issue of whether a *Doyle* violation may be negated by a curative instruction. Federal reviewing courts have held that instruction alone is never sufficient. See *United States v. Edwards* (5th Cir. 1978), 576 F.2d 1152; and *Morgan v. Hall* (1st Cir. 1978), 569 F.2d 1161.

Such a *per se* rule is at odds with *Chapman*, which requires a more individualized approach. Nevertheless, it cannot be said that beyond a reasonable doubt the instruction given in this case cured the error. The trial was essentially a credibility contest between defendant Miller and Randy Williams. The reference to post-arrest silence cast aspersions on Miller's credibility and may have irreparably prejudiced him in the eyes of the jury. Thus, reversal is required.

Defendant has alleged numerous other errors, but these have either

been waived for failure to raise them in his post-trial motion (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856), or will necessarily be decided anew by the trial judge based on the factual situation presented at defendant's new trial.

Reversed and remanded for new trial.

GREEN, P. J., and TRAPP, J., concur.