(No. 56561.—▮▮▮▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CHARLES MILLER, Appellee.

*Opinion filed April 13, 1983.—Rehearing denied May 27, 1983.*

Tyrone C. Fahner, Attorney General, of Springfield, and Tim P. Olson, State's Attorney, of Jacksonville (Michael B. Weinstein and Darrell Panethiere, Assistant Attorneys General, of Chicago, and Robert J. Biderman and Garry W. Bryan, of the State's Attorneys Appellate Service Commission, of Springfield, of counsel), for the People.

Daniel D. Yuhas, Deputy Defender, and Gary R. Peterson, Assistant Defender, of Springfield, for appellee.

JUSTICE MORAN delivered the opinion of the court:

Charles Miller (defendant), Clarence Armstrong and Randy Williams were charged by information with the offenses of murder, kidnaping, aggravated kidnaping and armed robbery of Neil Gorsuch in violation of sections 9—1(a)(1), 10—1(a)(2), 10—2(a)(5), and 18—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1), 10—1(a)(2), 10—2(a)(5), 18—2(a)). Defendant and Armstrong were tried separately. (Williams pleaded guilty to the charge of kidnaping and agreed to testify against defendant and Armstrong in return for which the State dismissed the other charges pending against him.) Following a jury trial in the circuit court of Morgan County, defendant was found guilty of all charges except armed robbery. He was, instead, found guilty of robbery. Although, in a separate sentencing proceeding, the State sought the death penalty, the jury recommended that

defendant be sentenced to imprisonment. The trial judge sentenced defendant to concurrent terms of 80 years' imprisonment for murder, 30 years for aggravated kidnaping, and seven years for robbery. (The judge vacated defendant's kidnaping conviction because it is a lesser included offense of aggravated kidnaping.) The appellate court reversed defendant's convictions and remanded the cause for a new trial on the ground that the prosecutor improperly cross-examined defendant regarding his post-arrest silence. (104 Ill. App. 3d 57.) We granted the State leave to appeal.

Although defendant, in his answering brief, alleges numerous errors in the trial court proceedings, we find it necessary to address only the following issues: (1) whether the prosecutor improperly cross-examined defendant as to his post-arrest silence, and (2) if so, whether the error was harmless beyond a reasonable doubt.

The record discloses that, during the evening of February 8, 1980, Randy Williams, his brother Richard, and Clarence Armstrong were drinking at the Regulator Tavern in Jacksonville. The victim, later identified as 23-year-old Neil Gorsuch, was also present at the tavern and occasionally conversed with Armstrong. Gorsuch was not previously acquainted with the Williams or Armstrong. At approximately 1:30 a.m. on February 9, 1980, all four individuals left the tavern together. Later that afternoon, the victim's body was discovered partially submerged in a creek near the Markham bridge in Morgan County.

Randy Williams, the State's chief witness, testified that Armstrong offered the victim a ride to the motel at which the victim was staying. Richard Williams was driving his girlfriend's car. Randy sat next to him in the front seat, and Armstrong and Gorsuch were in the back seat. Richard first drove himself to his home, where he and his girlfriend lived, and allowed Randy to borrow the car for the evening. He began driving, with the victim and Arm-

strong seated in the back seat.

Randy further stated that, after driving for some time, Armstrong began hitting Gorsuch. Although his reason for administering the beating is unclear, it seems that Armstrong believed the victim was making sexual advances. Randy eventually drove to his parents' house, at which time Armstrong took Randy's stocking cap and pulled it down over the victim's face. He then ordered him to go into the bathroom and wash off the blood. Once inside, it was discovered that the victim had defecated in his pants. He cleaned himself, and subsequently threw out his underwear.

While the victim was in the bathroom, Armstrong pocketed Randy's .32-caliber revolver which was loaded with one bullet. He also obtained Randy's shotgun and some ammunition.

The trio then returned to the car, and Armstrong shoved Gorsuch into the rear seat. He then sat in the front seat with Randy, and directed him to drive to a trailer court. Sometime during the ride, Armstrong fired the revolver into the back seat. The bullet did not strike the victim. Randy parked at the designated trailer home, which Armstrong then entered. He returned a few minutes later and sat in the front seat. Shortly thereafter, defendant emerged from the trailer and sat in the back seat of the car with the victim. Randy began driving again, at Armstrong's direction. He stated that it was still dark out at this time.

During the course of the ride, Armstrong requested the victim to perform fellatio. He refused, and Armstrong asked if he wanted to "be hurt." He still resisted, and Armstrong informed him that he was a "dead man." The defendant subsequently asked the victim if he had any money. When he indicated that he did, defendant began to hit him and demanded his money. Randy stated that he "heard" defendant rustling through the victim's pockets.

Armstrong directed Randy to stop the car when they reached the Markham bridge. Defendant exited the car, and Armstrong handed him the shotgun. Armstrong then pulled the victim out of the car, removed the stocking cap which was still covering his face, and pushed him against the railing of the bridge. Defendant, while standing at a distance of 10 to 12 feet from the victim, shot him in the back of the head. Armstrong reloaded the shotgun, and he also shot the victim in the head. He then placed a third shell in the gun, handed it to Randy, and ordered him to shoot the victim. Randy shot and missed, and the shell rolled through a gap in the bridge and dropped underneath. The gun was reloaded and Armstrong threatened Randy that he "better do it right, or we'll bury [you] with him." Randy fired a second shot at the victim and thought he may have hit him. Armstrong then grabbed the victim by the feet and "flipped" him over the railing of the bridge into the creek below.

At Armstrong's direction, Randy retrieved the spent shells, except the one which fell under the bridge. All three returned to the car and sat in the front seat, with Randy driving. The shells, and the victim's wallet and driver's license were thrown out the window on the passenger side of the car.

The witness further testified that he gave Armstrong a ride home, and then he and the defendant went to a cafe, owned by Mrs. Williams, for breakfast. It was beginning to get light when they arrived at the restaurant.

Later that evening, the defendant, the Williams brothers, and Richard's girlfriend went to the Williams' house. Randy stated that, while at his parents' home, he, Richard and defendant went into a bedroom to talk. At one point during the conversation, defendant admitted to participating in the killing.

During cross-examination, Randy's testimony was impeached in certain respects. Defense counsel elicited the

fact that, in a statement he gave the police following his arrest, he indicated that Armstrong fired the revolver into the rear seat of the car as they approached the murder site. He also, at one point, denied having any contact with the victim. In his statement, he indicated that Armstrong did not enter the trailer at which defendant was staying; he just opened the storm door and talked to somebody. Further, he named a different trailer park in his statement than the one in which defendant was staying.

As previously noted, Randy stated, on direct examination, that defendant was 10 to 12 feet away from the victim when he shot him. However, a pathologist testified that the victim died from contact or near-contact wounds. In addition, Randy did not tell the police officers about the conversation with his brother and defendant, during which defendant allegedly admitted his complicity in the murder. He only informed the officers that he told his brother "I think I might be in trouble." Randy admitted during cross-examination that he lied in his statement to the police. It was further disclosed that Randy had been drinking during most of the day on which the murder occurred and had taken a narcotic substance that evening. He was uncertain as to the routes he had driven on the evening of the murder or the amount of time which elapsed between events.

Finally, the defense called a doctor who testified that, in his opinion, the victim was not killed at the bridge because of the small amount of blood found on the bridge. However, on cross-examination, the doctor admitted that he never personally viewed the bridge or the victim's body. His opinion was based on photographs of the scene and a review of the report prepared by the pathologist who performed the autopsy. Further evidence indicated that there was a great deal of blood and brain matter located in the area around the bridge.

Although impeached in certain instances, Randy's testimony was corroborated in a number of particulars. Numerous witnesses confirmed that the Williams brothers and Armstrong left the tavern with the victim at approximately 1:30 a.m. on the day of the murder. Richard Williams testified as to the seating arrangement in the car, and that he was dropped off at home after leaving the tavern. Dr. Dietrich, a pathologist who performed the autopsy, confirmed Randy's testimony that the victim received a beating while he was still alive. He also indicated that death resulted from at least two shotgun wounds to the back of the head. Although there was a severe laceration on the victim's forehead, he did not believe this wound was lethal. The doctor further stated that the victim was fully clothed at the time of the autopsy, except that he was not wearing any underwear.

A forensic scientist testified that, in his opinion, all of the discharged shotgun shells were fired from Randy's 12-gauge shotgun. The witness also stated that a projectile which was recovered from the rear seat of Richard's girlfriend's car could have been fired from Randy's revolver. Three of the shells and the victim's driver's license were recovered by police in the approximate area where Randy had indicated the items were discarded. A fourth shotgun shell was found underneath the bridge.

A number of witnesses confirmed Randy's testimony that Armstrong arrived at the trailer where defendant was staying sometime during the early morning of February 8, 1980. They stated that defendant left with Armstrong at that time and did not return until after daylight. There was testimony to the effect that it was still dark when defendant left the trailer.

Mrs. Williams testified that her son and the defendant arrived at the restaurant at approximately 6:15 a.m. on the morning of the murder. She stated that it was just beginning to get light at that hour. Both parties stipulated

that the sun rose at 6:59 a.m. on February 9, 1980.

Richard Williams confirmed Randy's testimony that, on the evening following the murder, the defendant and Randy spoke with him in a bedroom at his parents' house. They both admitted to participating in the murder, and defendant warned him to "be quiet about it." On cross-examination, Richard admitted to having made a statement to a police officer in which he denied knowing the victim. He also denied any conversation with his brother regarding the crime, except that Randy told him he was in trouble.

Defendant testified in his own behalf. He essentially stated that, at approximately daybreak on the morning of February 9, 1980, Armstrong came to the trailer at which he was staying and said he needed advice. He later told the defendant that he had beaten the victim, and Randy said he hit him with a pair of "numchucks." According to defendant, they had killed the victim because they were afraid he would inform the police about the beating. Thus, it was defendant's contention that the victim was already dead when Armstrong and Randy sought his advice.

He further testified that, during the evening following the murder, Randy and Richard were conversing in a bedroom at their parents' home. Defendant said he overheard Randy say to his brother: "I really ain't kiddin'. I did kill that dude." At the conclusion of his testimony, defendant stated that he had been convicted of aggravated battery in 1976.

The prosecutor commenced his cross-examination of the defendant with the following questions:

"Q. Mr. Miller, how old are you?

A. 23.

Q. Why didn't you tell this story to anybody when you got arrested?"

Defense counsel immediately objected and asked to approach the bench. A discussion was held outside the presence of the jury, during which defense counsel requested a

mistrial on the grounds that defendant's right to remain silent was violated. The judge denied the motion for a mistrial, but sustained the objection and informed the jury "to ignore that last question, for the time being." This line of inquiry was not further pursued, nor was defendant's silence commented upon during the State's closing argument.

It is clear that where a defendant is given the *Miranda* warnings at the time of his arrest and exercises his right to remain silent, the State may not comment at trial upon his post-arrest silence. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.) However, in their briefs, both parties contend that the trial record does not indicate whether defendant received the *Miranda* warnings at the time of his arrest. They therefore characterize the issue as involving the propriety of cross-examining a defendant as to his post-arrest silence, in the absence of the *Miranda*-warning assurances. The State primarily cites *Fletcher v. Weir* (1982), 455 U.S. 603, 607, 71 L. Ed. 2d 490, 494, 102 S. Ct. 1309, 1312, for the proposition that, where a defendant does not receive *Miranda* warnings, it does not violate "due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." The defendant relies on *People v. Beller* (1979), 74 Ill. 2d 514, in which this court determined that the *Doyle* rule, prohibiting comment on a defendant's post-arrest silence, is applicable whether or not *Miranda* warnings have been given. Because we find that defendant did receive the *Miranda* warnings in the instant case, it is unnecessary to resolve the differing principles set forth in *Fletcher* and *Beller*.

We note initially that the parties' contentions assumed a different posture during oral argument. There, they each conceded that defendant did not receive the *Miranda* warnings at the time he was initially arrested, but that he was later informed of his rights at the police station. This point is significant under the circumstances of this case.

Testimony at a pretrial suppression hearing indicated

that defendant and Randy were arrested together at a gas station during the early morning of February 10, 1980. Although *Miranda* warnings were not administered, it is undisputed that defendant was arrested, at that time, for unlawful use of weapons. A police officer testified that, at the time of the arrest, he had no knowledge of defendant's complicity in the Gorsuch murder. Following their arrest, defendant and Randy were transported to the police station. Later that afternoon, Randy was interviewed by a police officer and gave a formal statement in which he implicated himself and defendant in the murder. A review of the common law record indicates that this interview was concluded at 2:30 p.m.

Also included in the common law record was an investigation report written by a police officer on February 11, 1980. This report indicates that, on February 10, 1980, Detectives Lieb and McKenna brought defendant into Lieutenant Turke's office for questioning concerning the murder. He was informed of his *Miranda* rights at 2:57 p.m. Defendant refused to talk and requested a lawyer, after which he was reincarcerated.

Under these circumstances, we conclude that defendant did receive the *Miranda* warnings at the time of his arrest for the *instant* offenses. The fact that he was not informed of these rights at the time of his initial arrest is irrelevant, since the unlawful-use-of-weapons charge was not the offense for which defendant was ultimately tried. Because defendant did receive the *Miranda* warnings at the relevant time, the rule enunciated in *Doyle* controls. Consequently, the State's inquiry during cross-examination violated defendant's right to remain silent.

The State next contends that, even if the prosecutor's inquiry concerning defendant's silence was improper, the error was harmless. Defendant asserts that the harmless-error doctrine is inapplicable because "[t]he prosecution's case was weak, premised solely on accomplice testimony." It is argued

that the trial was basically a credibility contest between defendant and Randy, and the reference to defendant's silence may have injured his credibility.

This court, along with a number of other courts, has determined that a *Doyle* violation may constitute harmless error. (See *People v. Beller* (1979), 74 Ill. 2d 514, 525, and cases cited therein.) As previously stated, defense counsel made a prompt objection to the prosecutor's inquiry, after which the trial judge instructed the jury to disregard the question. Normally, an instruction of this nature is sufficient to cure an error at trial. (*People v. Carlson* (1980), 79 Ill. 2d 564.) Defendant, however, cites three cases for the proposition that remarks concerning post-arrest silence cannot be cured by a "cautionary instruction." (See *People v. Scalisi* (1926), 324 Ill. 131; *People v. McCray* (1978), 60 Ill. App. 3d 487; *People v. Kilzer* (1978), 59 Ill. App. 3d 669.) These cases are inapposite.

In *Scalisi*, the prosecutor attempted to impeach the defendant with a statement he had previously made to him at the police station. Responding to an objection by defense counsel, the prosecutor stated, in the presence of the jury: "He is telling one story on the stand here, and at the time I talked to him right after the transaction he told an entirely different story; he was making a defense then; his counsel did not think it would get across in this case." (324 Ill. 131, 144.) This court determined that informing the jury to disregard the comment was insufficient to cure the error. However, this conclusion was based on the fact that the prosecutor, who was not sworn as a witness, stated a fact purporting to be within his personal knowledge. This misconduct is dissimilar to that involved in the instant case, and was one of many errors noted by the court in reversing the cause.

In *McCray*, the defendant, charged with robbery, testified on his own behalf. During cross-examination, the prosecutor inquired as to whether defendant had "[a]ny occupa-

tion other than robbing people." (*People v. McCray* (1978), 60 Ill. App. 3d 487, 489-90.) This error, for which the cause was reversed, simply did not involve any reference to defendant's post-arrest silence. Similarly, the reversal of defendant's conviction in *Kilzer* was not based upon a *Doyle* violation. In *Kilzer*, the prosecutor improperly commented upon defendant's allegedly prior inconsistent statement which was not introduced into evidence. The court determined that the verdict may have been otherwise had the remarks not been made.

Here, it is our view that, beyond a reasonable doubt, the prosecutor's improper inquiry did not affect the verdict. In addition to the fact that the jury was informed to disregard the question, it was but a single, isolated reference to defendant's post-arrest silence made during the course of a lengthy trial. Further, the evidence, as previously recited, was sufficient to prove defendant's guilt beyond a reasonable doubt. We do not consider this "a case in which, absent the constitutionally forbidden [inquiry], honest, fair-minded jurors might very well have brought in [a] not-guilty [verdict]." *Chapman v. California* (1967), 386 U.S. 18, 25-26, 17 L. Ed. 2d 705, 711, 87 S. Ct. 824, 829.

For the above-stated reasons, the judgment of the appellate court is reversed, and the cause is remanded to the appellate court with directions to consider the other issues raised by defendant in that court but not decided.

*Reversed and remanded,*
*with directions.*

JUSTICE SIMON, dissenting:

The prosecutor's improper inquiry into the defendant's post-arrest silence was not harmless error. A prosecutor's comment upon the "silence of the accused is a crooked knife and one likely to turn in the prosecutor's hand. The circumstances under which it will not occasion a reversal are few and discrete." (*United States v. Edwards* (5th Cir. 1978), 576 F.2d 1152, 1155.) I would affirm the judgment of the

appellate court which reversed the defendant's convictions of murder, aggravated kidnaping and robbery, and remand the cause to the circuit court of Morgan County for a new trial.

The State's case against the defendant depended heavily upon the testimony of Randy Williams, the defendant's alleged accomplice. As the appellate court observed, "nothing except Williams' testimony directly links [the defendant] with the crimes." 104 Ill. App. 3d 57, 61.

Accomplice testimony of this kind is inherently unreliable as it often may be motivated by pressures other than the witness' desire to reveal the truth, "such as the promise of leniency or immunity and malice toward the accused." (*People v. Wilson* (1977), 66 Ill. 2d 346, 349.) This court has often stated that it "will not hesitate to reverse a conviction based upon the testimony of an accomplice when that testimony lacks material corroboration or is discredited by other credible evidence." *E.g., People v. Hermens* (1955), 5 Ill. 2d 277, 286.

In this case, the defendant vigorously disputed Williams' version of the events on the evening of the murder and the following morning. The defendant denied any involvement in the crime and implicated Williams. The jury had the sole responsibility for resolving the sharp conflict between the testimony of Williams and the testimony of the defendant. The resolution of this conflict depended totally upon the jury's assessment of the defendant's credibility, for the other evidence in the case could have fairly supported either the defendant's or Williams' story. The record clearly shows that the prosecutor, the trial court judge and the appellate court all understood that "[t]he trial was essentially a credibility contest between defendant *** and Randy Williams." 104 Ill. App. 3d 57, 61.

Given the importance of the defendant's credibility at his trial, I cannot say beyond a reasonable doubt that the prosecutor's reference to the defendant's post-arrest silence did

not affect the jury's verdict. The prosecutor's statement—"Why didn't you tell the story to anybody when you got arrested?"—was obviously calculated to undermine the credibility of the defendant's story with the jury. I do not understand how anyone could know beyond a reasonable doubt that it did not succeed.

The majority erroneously maintains that the trial court's cautionary instructions rendered the prosecutor's improper inquiry harmless error. An improper inquiry by the prosecutor concerning the defendant's post-arrest silence is not automatically remedied by a cautionary instruction. (See *e.g., United States v. Curtis* (3rd Cir. 1981), 644 F.2d 263, 270-71; *cert. denied* (1982), 459 U.S. 1018, 74 L. Ed. 2d 512, 103 S. Ct. 379; *United States v. Prescott* (9th Cir. 1978), 581 F.2d 1343, 1352; *Morgan v. Hall* (1st Cir. 1978), 569 F.2d 1161, 1168, *cert. denied* (1978), 437 U.S. 910, 57 L. Ed. 2d 1142, 98 S. Ct. 3103; see also, *United States v. Hale* (1975), 422 U.S. 171, 45 L. Ed. 2d 99, 95 S. Ct. 2133.) If the majority were correct, the prosecutor would have little incentive to avoid such inquiries on cross-examination of the defendant; he could safely inform the jury of the defendant's post-arrest silence, risking only an objection by the defendant's counsel and a cautionary instruction by the trial court. A cautionary instruction is at best only a partial remedy. *Cf. Bruton v. United States* (1968), 391 U.S. 123, 136-37, 20 L. Ed. 476, 485, 88 S. Ct. 1620, 1628.) The instruction may confuse the jury; or the jury may disregard it and use the defendant's silence against him anyway. In a close case like this one, based wholly upon accomplice testimony and circumstantial evidence, the reference to post-arrest silence can work extreme prejudice against the defendant, notwithstanding a cautionary instruction. In such cases the defendant must receive a new trial, for the *Miranda* warnings mean nothing unless an innocent defendant can remain silent at his arrest without prejudicing his case.

Even if a proper cautionary instruction could have cured

the prosecutor's improper reference to the defendant's post-arrest silence, the instruction given in this case was insufficient. The trial court only directed the jury to ignore the prosecutor's remarks *"for the time being."* This instruction is not a precise and unambiguous statement to the jury that it should ignore the prosecutor's remarks. Given that the trial was essentially a credibility contest between Williams and the defendant, this opaque instruction did not render the prosecutor's remarks harmless error. It did not prevent the prosecutor's highly questionable cross-examination tactic from infecting the defendant's entire testimony and lowering its value to the jury.

In my opinion, the prosecutor's improper remarks were not harmless error and the judgment of the appellate court should be affirmed and the cause remanded to the circuit court for a new trial.