UNITED STATES of America ex rel. Charles "Chuck" MILLER, Petitioner-Appellant,

v.

James GREER, Warden, Menard Correctional Center, Respondent-Appellee.

No. 84–2679.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 5, 1986.

Decided April 9, 1986.

Cummings, Chief Judge filed dissenting opinion, in which Harlington Wood, Jr. and Coffey, Circuit Judges joined.

Easterbrook, Circuit Judge filed dissenting opinion.

Daniel D. Yuhas, Office of State Appellate Defender, Judith N. Kirby, Springfield, Ill., for petitioner-appellant.

Marie Quinlivan Czech, Atty. Gen. Office, Chicago, Ill., for respondent-appellee.

Before CUMMINGS, Chief Judge, and BAUER, WOOD, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge, with whom BAUER, CUDAHY, POSNER, and RIPPLE, Circuit Judges, join.

Petitioner Charles Miller appeals the district court's denial of his petition for writ of habeas corpus, contending that his constitutional rights were violated when the prosecutor improperly commented on his post-arrest silence during his trial in state court for murder, kidnapping, and robbery. This court reversed the district court in a panel opinion issued August 27, 1985. Rehearing en banc was granted on November 14, 1985 and the original decision vacated. We reverse the district court's denial of the writ.

## I.

This case involves the brutal kidnapping, murder, and robbery of Neil Gorsuch during the early morning hours of February 9, 1980, in Morgan County, Illinois. Miller was indicted for the crimes on February 11, 1980, along with Clarence Armstrong and Randy Williams. Williams entered into a plea agreement with the state whereby the murder, aggravated kidnapping, and robbery charges against him were dropped in exchange for his guilty plea to one count of kidnapping and his testimony in the separate trials of Miller and Armstrong.

Randy Williams testified at trial as follows: he, his brother Rick, and Armstrong met Gorsuch in a tavern on the evening of February 8. The four men left together at about 1:30 a.m. the following morning, Armstrong having offered to give Gorsuch a ride back to his motel. After taking Rick home, Williams started driving to Gorsuch's motel. En route, Armstrong began beating Gorsuch in the back seat. Armstrong then told Williams to drive to Williams's house, where Armstrong again beat Gorsuch and got Williams's twelve-gauge shotgun out of the bedroom. The three men then got back into the car and drove to the trailer home where Miller was staying. While Williams and Gorsuch waited in the car, Armstrong went in and talked briefly to Miller. Armstrong and Miller then left the trailer and got into the car. Williams

drove to a bridge in an isolated rural area, where Armstrong removed Gorsuch from the car and stood him up against the bridge railing. Williams, Armstrong, and Miller then each shot Gorsuch once in the head with the shotgun, and Armstrong pushed the body over the railing into the creek below.

Charles Miller testified that Armstrong came to his trailer in the early morning hours of February 9 and said that he needed to talk to Miller because he and Williams had killed somebody. Miller went with Armstrong to Williams's house and talked to the two men for awhile. He and Williams then took Armstrong home and had breakfast at Dottie's Cafe, which was run by Williams's mother. After breakfast, Miller returned to the trailer. He and Williams were arrested that night at a gas station on their way home from a party.

Other witnesses testified that Gorsuch left the tavern on the morning of February 9 in the company of the two Williams brothers and Armstrong. The people in the trailer where Miller was staying that night testified that Armstrong arrived at the trailer during the early morning hours of February 9 (estimates varied from 4:15 a.m. to 6:30 a.m.) and left with Miller after a short conversation. Williams's mother testified that Williams and Miller arrived at her cafe for breakfast at approximately 6:15 a.m. Shotgun shells, other evidence found near the bridge, and the autopsy reports indicated that the murder had taken place essentially as Williams described.

After Miller testified, the prosecutor began his cross-examination by asking:

PROSECUTOR: Mr. Miller, how old are you?

DEFENDANT: Twenty-three.

PROSECUTOR: Why didn't you tell this story to anybody when you got arrested?

Defense counsel immediately objected and, out of the presence of the jury, asked for a mistrial. The judge denied the motion and instructed the jury to "ignore that last question for the time being." The judge did not further instruct the jury on the

prosecutor's reference to Miller's post-arrest silence.

The jury found Miller guilty of robbery, kidnapping, aggravated kidnapping, and murder. He was found not guilty of armed robbery. Miller was sentenced to concurrent terms of eighty years for murder, thirty years for aggravated kidnapping, and seven years for robbery.[1]

On direct appeal, a unanimous panel of the Illinois Appellate Court reversed Miller's conviction and remanded for a new trial. *People v. Miller*, 104 Ill.App.3d 57, 59 Ill.Dec. 864, 432 N.E.2d 650 (1982). The appellate court held that the prosecutor's reference to Miller's post-arrest silence directly violated *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and that the trial court's attempt to cure the error was insufficient. 104 Ill.App.3d at 61, 59 Ill.Dec. at 867–68, 432 N.E.2d at 653–54. The appellate court found that the evidence against Miller was not overwhelming:

> [T]here is corroboration for the testimony of the accomplice, Randy Williams. However, nothing except Williams' testimony directly links Miller with the crimes.
>
> . . . . .
>
> The trial was essentially a credibility contest between defendant Miller and Randy Williams. The reference to post-arrest silence cast aspersions on Miller's credibility and may have irreparably prejudiced him in the eyes of the jury. Thus, reversal is required.

*Id.* at 61, 59 Ill.Dec. at 868, 432 N.E.2d at 654.

The Illinois Supreme Court granted leave to appeal and reversed the appellate court's decision. *People v. Miller*, 96 Ill.2d 385, 70 Ill.Dec. 879, 450 N.E.2d 322 (1983). The majority held that although the prosecutor's comment violated *Doyle*, the error was harmless because the comment was a single, isolated reference during the course of a lengthy trial, because Randy Wil-

liams's testimony was corroborated in many respects, and because the jury was instructed to disregard the comment. *Id.* at 396, 70 Ill.Dec. at 884, 450 N.E.2d at 327. In dissent, Justice Simon pointed out that accomplice testimony is inherently unreliable and that the judge's allegedly curative instruction was insufficient. *Id.* at 397–99, 70 Ill.Dec. at 885–86, 450 N.E.2d at 328–29.

Charles Miller filed a petition for a writ of habeas corpus in the United States District Court on August 22, 1983, pursuant to 28 U.S.C. § 2254 (1982). On August 27, 1984, the district court entered an order granting the state's motion for summary judgment and denying the petition for the writ. *United States ex rel. Miller v. Greer*, No. 83–3254 (C.D. Ill. Aug. 27, 1984). The district court essentially adopted the Illinois Supreme Court's analysis, holding that the state's violation of *Doyle* was harmless beyond a reasonable doubt.

## II.

■ The Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that "the use for impeachment purposes of [a] petitioner['s] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. at 2245. The state's first argument in response to Miller's appeal is that, despite the fact that the Illinois Appellate Court, the Illinois Supreme Court, the United States District Court, and this court's original panel all held otherwise, there was no *Doyle* violation in this case.

Charles Miller was not given *Miranda* warnings when he and Williams were arrested at a gas station in the early morning hours of February 10, 1980, for unlawful use of weapons (a handgun was found under the seat of the car that they were driving). Later that day, Williams gave a

---

1. The trial court vacated Miller's kidnapping conviction because kidnapping is a lesser-included offense of aggravated kidnapping.

formal statement to the police implicating himself, Armstrong, and Miller in Gorsuch's murder. Immediately following Williams's statement, at 2:57 p.m., Miller was given *Miranda* warnings and arrested for the murder, kidnapping, and robbery of Neil Gorsuch.

The state concedes that Miller was given *Miranda* warnings at the time of his arrest for the instant offenses and that any comment referring to his silence after that arrest would be improper. It nevertheless argues that the prosecutor's reference to Miller's post-arrest silence could be construed as referring to the period between Miller's arrest on the weapons charge, when no *Miranda* warnings were given, and his arrest on the murder charge and receipt of *Miranda* warnings later that afternoon, and that the prosecutor's comment therefore did not violate Miller's due process rights. *See Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982) (not improper to comment on post-arrest silence in the absence of *Miranda* warnings, which affirmatively assure a defendant that he has the right to remain silent); *Feela v. Israel*, 727 F.2d 151, 157 (7th Cir.1984) (same). The state asserts that it would have been natural for Miller to have attempted to exculpate himself from any involvement in the Gorsuch murder during the period following his initial arrest because he was arrested with Williams and knew of Williams's involvement in the crime.

We cannot agree with the respondent's contentions. Although the prosecutor's question may have been intended to refer in part to Miller's silence following his arrest on the weapons charge, it cannot seriously be maintained that the prosecutor intended no reference to Miller's silence after his arrest for Neil Gorsuch's murder. From the jury's standpoint, the only reasonable inference to be drawn from the prosecutor's question—"Why didn't you tell this story to anybody when you got arrested?"—is that Miller was silent at the time of his arrest for the offenses for which he was then on trial.

The respondent asserts that it would have been "natural" for Miller to attempt to exculpate himself when he was arrested on the weapons charge merely because he was with Randy Williams. Although Williams may already have been a suspect in the murder because he had been seen leaving the tavern with Gorsuch, Miller was never even implicated in the crime until Williams gave his formal statement to the police later that day. It is not in the least bit "natural" for a person to try to exculpate himself of a crime of which he has not been accused. Indeed, the statement—"I did not kill anybody"—upon being arrested for unlawful use of weapons, drunken driving, or running a red light, would tend only to inculpate, rather than exculpate, the arrestee.

■ We conclude, as did the courts before us, that Miller was advised of his right to remain silent for purposes of *Doyle* when he was given the *Miranda* warnings at the time of his arrest for the offenses charged at trial. *See People v. Miller*, 96 Ill.2d at 394, 70 Ill.Dec. at 883, 450 N.E.2d at 326. The prosecutor's reference to Miller's silence at the time of his arrest therefore violated his constitutional right to a fair trial. *Id.*

### III.

■ The conclusion that there was a *Doyle* violation in this case does not end the inquiry, however, since constitutional trial errors of this sort can in certain circumstances constitute harmless error. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The Supreme Court has imposed on the government the burden of proving "beyond a reasonable doubt that the [constitutional] error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. The circuits universally apply this "harmless beyond a reasonable doubt" standard to *Doyle* violations. *See, e.g., United States v. Elkins*, 774 F.2d 530, 539 (1st Cir.1985); *Hawkins v. LeFevre*, 758 F.2d 866, 877 (2d Cir.1985); *United States v. Cummiskey*, 728 F.2d

200, 204 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1869, 85 L.Ed.2d 162 (1985); *Williams v. Zahradnick,* 632 F.2d 353, 360 (4th Cir.1980); *Chapman v. United States,* 547 F.2d 1240, 1248 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *Martin v. Foltz,* 773 F.2d 711, 715 (6th Cir.1985); *United States v. Disbrow,* 768 F.2d 976, 980 (8th Cir. 1985); *United States v. Ortiz,* 776 F.2d 864, 865 (9th Cir.1985); *United States v. Remigio,* 767 F.2d 730, 735 (10th Cir.1985); *United States v. Ruz-Salazar,* 764 F.2d 1433, 1437 (11th Cir.1985).

This circuit is no exception, *see, e.g., United States v. Shue,* 766 F.2d 1122, 1133 (7th Cir.1985) (Wood, J.). In this circuit alone, however, the possibility has been raised that a less stringent harmless error standard may be appropriate to *Doyle* situations. Concurring opinions to our *en banc* decision in *Phelps v. Duckworth* addressed the issue, although the majority there expressly declined to reach it. 722 F.2d 1410, 1414 (7th Cir.1985). Moreover, the state pressed this position during oral argument in this case, as does Judge Easterbrook in his dissent. Proponents of the lesser standard make several arguments. First, they urge that the Supreme Court in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), adopted a two-level harmless error standard: the *Chapman* standard for direct violations of rights specifically enumerated in the Bill of Rights, and a standard requiring the defendant to demonstrate that the violation had a substantial influence on the trial for fourteenth amendment violations. As a variant of this position, it has been suggested that the latter standard is applicable because *Doyle* is not an innocence-protecting rule but, rather, a prophylactic rule designed only to buttress *Miranda,* another prophylactic doctrine. A third var-

iant argues that, no matter what the standard applied to direct appeals of *Doyle* violations, constitutional rules are enforced less strictly on habeas corpus review.

Analysis of these arguments is aided by the Supreme Court's recent pronouncement in *Wainwright v. Greenfield,* —— U.S. ——, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). There, in its review of a habeas petition, the Court affirmed the Eleventh Circuit's decision that *Doyle* is violated when a prosecutor uses post-*Miranda* warnings silence as evidence of sanity. Although the harmless error issue was not before the Court, *Greenfield* is particularly notable for its strong affirmation of *Doyle's* constitutional underpinnings and for the twice-mentioned assumption in Justice Rehnquist's concurrence that the *Chapman* standard applies to habeas review of *Doyle* violations. *See* Rehnquist, J., concurring (joined by Burger, C.J.). Guided by this and other precedent discussed below, we conclude that the "harmless beyond a reasonable doubt" standard remains the law to which we must adhere, and that the state's position and its variants are misguided.

First, a careful reading of *Donnelly* and other cases reveals that the Supreme Court does not vary the harmless error standard with the kind of constitutional right at issue. Rather, the Court prescribes one standard—the *Chapman* standard—for determining harmlessness in the context of constitutional trial error and another standard for determining whether ordinarily nonconstitutional trial error, for example, prosecutorial misconduct, is so prejudicial as to rise to the level of a due process violation.[2] Once the trial error has been identified as one of constitutional magnitude, then the *Chapman* standard is applied to determine whether the conviction must be reversed. For a recent explana-

**2.** There may also be a different approach to constitutional errors that do not affect trials. The Supreme Court in *Morris v. Mathews,* —— U.S. ——, 106 S.Ct. 1032, 89 L.Ed.2d 187 (1986), held that in the double jeopardy context, once a jeopardy-barred conviction is removed and a lesser-included offense conviction substituted, the defendant bears the burden of demonstrat-

ing that the jury would not have convicted him of the lesser-included offense. The majority in *Morris* stressed the distinction between double jeopardy cases and cases involving constitutional trial errors, stating that "this [*Morris*] is not a 'harmless error' case." *Id.* at 1037. Thus, the *Morris* approach does not pertain to our analysis.

tion of this distinction, *see United States v. Mazzone,* 782 F.2d 757, 763 (7th Cir.1986) (Posner, J.). *See also United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 1045 n.10, 84 L.Ed.2d 1 (1985).

*Donnelly* itself made clear this scheme, explaining that the habeas petitioner there could point to nothing in his trial that specifically violated the constitution, such as prosecutorial comments on his right to remain silent. 416 U.S. at 643, 94 S.Ct. at 1871. Instead, the petitioner complained of the prosecutor's expression of personal opinion as to guilt, an error that would not implicate the petitioner's fourteenth amendment right to due process unless it actually "infected the trial with unfairness." *Id.* Thus, the petitioner has an uphill battle when he seeks to establish general trial error as constitutional error. But where the violation at trial *is* one of constitutional magnitude, then the government bears the "more onerous" burden of *Chapman. See United States v. Lane,* —— U.S. ——, 106 S.Ct. 725, 730 n.9, 88 L.Ed.2d 814 (1986) (Burger, C.J.) ("the standard for harmless-error analysis adopted in *Chapman* concerning constitutional errors is considerably more onerous than the standard for nonconstitutional errors adopted in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)"). In *United States v. Bagley,* the Court was urged to reverse automatically or apply the *Chapman* standard to the government's failure to disclose impeachment material to the defendant. —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The Court explained that a threshold inquiry first had to be undertaken to determine whether the nondisclosure amounted to a constitutional violation: "such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial."

105 S.Ct. at 3381. Justice Marshall argued in dissent that *any* suppression of impeachment evidence should be considered constitutional error and thus urged the Court to "apply our normal constitutional error test and reverse unless it is clear beyond a reasonable doubt that the withheld evidence would not have affected the outcome of the trial." 105 S.Ct. at 3394–95 (Marshall, J.). The express underpinning of *Bagley* was *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976): "to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial."

Thus, the Court to date never has differentiated for harmless error standard purposes between Bill of Rights and fourteenth amendment violations,[3] or between *Doyle* and other constitutional trial violations, or between direct and collateral review of constitutional violations. Indeed, the Court continues to manifest its complete adherence to a unitary standard of harmless error for constitutional trial violations. For example, the Court recently reaffirmed the constitutional/nonconstitutional distinction and the viability of *Chapman* as *the* analysis for constitutional trial errors, see the language from *Lane, supra* p. 9. Regarding *Doyle* specifically, its constitutional importance was reiterated by the Court in *Greenfield.* That opinion makes clear that *Doyle* is not of "secondary" constitutional status and is not merely a rule designed to increase adherence to *Miranda.* Instead, the court emphasized that drawing attention to post-*Miranda* warnings silence is fundamentally unfair and constitutes a direct, wholly independent violation of the due process clause of the fourteenth amendment.[4] 106 S.Ct. at

**3.** In any event, it may be inappropriate to do so since all Bill of Rights provisions are enforced against the states as fourteenth amendment rights.

**4.** It may taint the truth-seeking process as well. Silence after a state authority has promised that any statement one makes may be used at trial surely has questionable probative value. The

Supreme Court suggested as much in *United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975), and the difference in probative value between post-warnings silence and silence without warnings formed part of the Court's rationale in *Fletcher v. Weir* for holding that only post-warnings silence implicates *Doyle.*

638–39. *See, e.g., South Dakota v. Neville,* 459 U.S. 553, 565, 103 S.Ct. 916, 923, 74 L.Ed.2d 748 (1983); *Fletcher v. Weir,* 455 U.S. 603, 604–05, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982).

Finally, Justice Rehnquist's assumption in *Greenfield* that the *Chapman* standard would apply there, 106 S.Ct. at 641, 644, is an additional entry in a long list of evidence that leads to the conclusion that *Chapman* is the law for *Doyle* violations in the context of habeas review. Although *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), precluded collateral review of exclusionary rule claims litigated in state proceedings, we can find nothing to indicate that where collateral review is permitted, the Court has prescribed a different standard for determining harmlessness.[5] The *Stone* doctrine, moreover, depends on the peculiar nature of the exclusionary rule as a "judicially created remedy rather than a personal constitutional right," 428 U.S. at 495 n.37, 96 S.Ct. at 3052 n. 37. In an exclusionary rule situation, the constitutional violation occurs pre-trial and the rule operates to discourage law enforcement officials from future infidelity to the constitutional strictures. *Id.* at 492, 96 S.Ct. at 3051. Thus, the Court reasonably could conduct a cost/benefit analysis and conclude that collateral review there is unnecessarily costly, since there is no "reason to assume that any specific disincentive already created by the risk of exclusion of evidence at trial or the reversal of convictions on direct review would be enhanced if there were the further risk" of overturning convictions in federal habeas proceedings. *Id.* at 493, 96 S.Ct. at 3052. By contrast, the violation at issue in a *Doyle* situation is constitutional and personal to the petitioner. It occurs when the post-warnings silence is used at trial, and it offends due process. It denies the petitioner a fair trial, unless, and only unless, it can be said that the petitioner beyond reasonable doubt would have been convicted in the absence of the violation. Unless we are to conduct our own cost/benefit analysis and declare habeas relief from constitutional violations a thing of the past, this inquiry remains our responsibility. Accordingly, the *Doyle* violation must be examined in the context of petitioner Miller's trial in order to determine whether it was harmless beyond a reasonable doubt.

## IV.

■ The Illinois Supreme Court based its conclusion that the prosecutor's improper comment was harmless error on three factors: the comment was a single, isolated reference during the course of a lengthy trial, Williams's testimony was corroborated in many respects, and the trial judge gave a curative instruction. We cannot agree with the Illinois Supreme Court's reliance on these factors. Beginning with the court's observation that the prosecutor's improper comment was but a single, isolated reference to Miller's post-arrest silence during the course of a week-long trial, we believe that the timing of the comment overshadows its singularity. No matter how many days a trial may have lasted or how many witnesses may have appeared, the jury will pay close attention when a defendant accused of crimes as horrible as these takes the stand. That attention undoubtedly is heightened when the prosecutor rises to attack the defendant's story on cross-examination. When one of the first questions from the prosecutor is "Why didn't you tell this story to anybody when you got arrested?", the com-

455 U.S. 603, 604–06, 102 S.Ct. at 1310–11 (1982).

5. Any confusion on this point may be engendered by a possible misreading of *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). In *Henderson,* the Court reversed a grant of the writ because it found that the petitioner's due process rights had not been violated by deficient jury instructions. The Court noted that the petitioner's burden in making a collateral attack on constitutionality was greater than in seeking direct review, because the question on direct review in the state court was merely whether the instruction was "undesirable, erroneous, or even universally condemned." *Id.* at 154, 97 S.Ct. at 1737.

ment cannot be so easily dismissed as a single, isolated reference.

Turning to the corroboration of Randy Williams's testimony, the bulk of the testimony and physical evidence cited by the Illinois Supreme Court corroborated portions of Randy Williams's testimony that Miller did not even dispute: (1) that Williams, his brother Rick, Armstrong, and Gorsuch left the tavern together at approximately 1:30 a.m. on the morning of February 9; (2) that Gorsuch was beaten and then killed on the bridge by several shotgun blasts to the head; (3) that Armstrong went to the trailer where Miller was staying sometime that morning, talked to him briefly, and then left with him; and (4) that Williams and Miller had breakfast together near daybreak that morning at Dottie's Cafe.

 With regard to the crucial part of Williams's testimony—his assertion that Miller took part in the murder of Neil Gorsuch—there was no direct corroborative evidence[6] and Miller denied being present when the murder was committed. There was no reason to find Miller's testimony particularly incredible or Randy Williams's testimony particularly credible on this point, especially since accomplice testimony of this kind is inherently unreliable, often motivated by factors such as malice toward the accused and a promise of leniency or immunity.[7] In short, this evidence does not approach the overwhelming evidence necessary to overcome constitutional error such as a *Doyle* violation. *Compare United States v. Hasting,* 461 U.S. 499, 511–12, 103 S.Ct. 1974, 1981–82, 76 L.Ed.2d 96 (1983) (finding harmless error where vic-

tims promptly picked the defendants out of a line-up, neutral witnesses corroborated critical aspects of the victims' testimony, property of the victims was found in one of the defendant's possession, and there was identification of the car used and one of the defendant's fingerprints); *Feela v. Israel,* 727 F.2d 151, 157 (7th Cir.1984) (finding harmless error where defendant had an implausible alibi and was arrested near the scene of the robbery with the vest, gloves, and handgun used by the robber); *United States v. Wilkins,* 659 F.2d 769, 774 (7th Cir.) (finding harmless error where defendant was arrested in the getaway car with the stolen money and guns several blocks from the bank), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981). The crux of this trial was whether the jury believed the Williamses or believed Miller. The prosecutor's improper inquiry, magnified by coming at a time when the jury's attention was focused on Miller, cast substantial doubt on Miller's credibility. We simply cannot assume beyond a reasonable doubt that the prosecutor's comment had no effect on the jury's assessment of Miller's credibility, and hence on the jury's verdict. *See, e.g., Velarde v. Shulsen,* 757 F.2d 1093, 1095 (10th Cir.1985) (where case comes down to the word of defendant against the word of key prosecution witness, *Doyle* violation can never be harmless); *United States v. Harp,* 536 F.2d 601, 603 (5th Cir.1976) (where *Doyle*-violative remark strikes at the "jugular" of defendant's story, error cannot be classified as harmless).

 Finally, in regard to the allegedly curative instruction given by the trial judge, we believe that the judge's admoni-

---

6. Rick Williams testified that on the evening following Gorsuch's murder, Randy Williams and Miller told Rick that they had killed Gorsuch and that Rick should keep quiet about it if the police began asking questions. Miller denied being present when this conversation took place. At most, this testimony provides indirect evidence that Miller was involved in the murder. Moreover, Rick Williams knew at the time of his testimony that his brother Randy had been promised leniency in exchange for testifying at trial. Thus Rick's credibility is questionable, since his testimony in no way endangered

his brother and in fact may have been helpful in making Randy's version of the murder more attractive to the state.

7. Counsel for the state represented during oral argument that the state had agreed prior to Miller's trial to drop all charges against Williams except for kidnapping, in return for his testimony. After Miller's conviction, Williams was sentenced on the kidnapping charge to two years of probation. Miller and Armstrong each were sentenced to eighty years in prison.

tion to ignore the prosecutor's reference to Miller's post-arrest silence "for the time being" was simply too ambiguous in the setting of a clear-cut *Doyle* violation to cure the effect of the prosecutor's improper comment. The record reflects that the judge was apparently unaware that the prosecutor's question was a violation of *Doyle*. At the side bar conference following defense counsel's objection to the prosecutor's comment, the judge stated: "I will do some checking during the time he is on the witness stand on Cross Examination and if I find where he can, I will let him ask the question." Thus, the instruction that the judge gave to the jury reflected what he apparently was thinking at the time, which was that the jury might be able to consider the prosecutor's comment and the implications arising therefrom at some point in the future. Because of the important fourteenth amendment guarantees protected by *Doyle*, we hesitate to hold that anything other than a clear, immediate, and unambiguous cautionary instruction can be sufficient to cure a *Doyle* violation. *See United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1303 (7th Cir.1985) (final jury instructions ordinarily not sufficient to cure constitutional errors). Even if we were willing to consider a flawed cautionary instruction sufficient under certain circumstances, we could not conclude that the *Doyle* violation in the circumstances of this case was rendered harmless by the trial judge's obscure instruction.

In sum, we hold that the state has not met its burden of proving that the prosecutor's clear violation of *Doyle* was harmless beyond a reasonable doubt. In reaching this conclusion, we are not unmindful of the appropriateness of deferring to the state courts' assessment of the impact of prosecutorial error on state trials. However, we are respectfully unable to accept the Illinois Supreme Court's analysis in this case, although our conclusions track closely those of the unanimous Illinois Appellate Court. Because the crucial issue at trial was credibility, the *Doyle* violation went to the heart of the truth-seeking process. The evidence against Miller was not over-whelming, his story was not implausible, and the trial court's cautionary instruction was insufficient to cure the error. In these circumstances, we must conclude that it is not clear beyond a reasonable doubt that, absent the prosecutor's improper comment, the jury would have found Miller guilty of the crimes for which he was convicted.

V.

The district court's judgment denying a petition for a writ of habeas corpus is accordingly reversed, and the matter remanded with instructions to order Miller's release from custody unless the state retries him within the 120-day time limit.

CUMMINGS, Chief Judge, with whom WOOD and COFFEY, Circuit Judges, join, dissenting.

I dissented from the panel opinion (reported in 772 F.2d 293) because of my agreement with the reasoning of the Illinois Supreme Court when in *People v. Miller*, 96 Ill.2d 385, 70 Ill.Dec. 849, 450 N.E.2d 322 (1983), it disposed of Miller's appeal from the Appellate Court of Illinois. I still fully agree with the Illinois Supreme Court's rationale:

Here, it is our view that, beyond a reasonable doubt, the prosecutor's improper inquiry did not affect the verdict. In addition to the fact that the jury was informed to disregard the question, it was but a single, isolated reference to defendant's post-arrest silence made during the course of a lengthy trial. Further, the evidence, as previously recited, was sufficient to prove defendant's guilt beyond a reasonable doubt. We do not consider this "a case in which, absent the constitutionally forbidden [inquiry], honest, fair-minded jurors might very well have brought in [a] not-guilty [verdict]." *Chapman v. California* (1967), 386 U.S. 18, 25–26, 17 L.Ed.2d 705, 711, 87 S.Ct. 824, 829.

96 Ill.2d at 396, 70 Ill.Dec. 849, 450 N.E.2d 322.

While the majority opinion here relies on the Supreme Court's most recent treatment of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 44 L.Ed.2d 91, in *Wainwright v. Greenfield*, —— U.S. ——, 106 S.Ct. 634, 88 L.Ed.2d 628, the Florida attorney general did not claim in *Greenfield* that the prosecutor's comment on Greenfield's silence was harmless error. 106 S.Ct. at 640–41 n.13, 644. The majority opinion concludes here, like the concurring opinion in *Greenfield*, that a *Doyle* error is still to be judged by the "harmless beyond a reasonable doubt" standard.[1]

While I also believe that the "harmless beyond a reasonable doubt" standard still governs *Doyle* violations, the district court and the Illinois Supreme Court rightly considered that under that standard this fifteen-second colloquy,[2] alleviated by the trial judge's immediately sustaining the defendant's objection and instructing the jury to ignore the prosecutor's improper question[3] and by a threshold jury instruction to disregard questions to which objections were sustained (Trial Court Record C368 and C420), did not affect the verdict. The district court's judgment should be affirmed.

EASTERBROOK, Circuit Judge, dissenting.

The majority identifies a violation of the principles of *Doyle v. Ohio*, 426 U.S. 610,

96 S.Ct. 2240, 44 L.Ed.2d 91 (1976), and inquires whether this violation is harmless "beyond a reasonable doubt," the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It concludes that the error is not harmless under this exacting standard and holds that the writ of habeas corpus must issue. I do not quarrel with the majority's conclusion that there was a violation, which is not harmless if the *Chapman* standard governs.[1] But I disagree with the basis of the majority's holding—the conclusion that *Chapman* applies to all violations of the constitution. The court should apply the standard of *United States v. Lane*, —— U.S. ——, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), and *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), under which a violation requires a new trial only if it "had substantial influence" on the course of the trial. See *Phelps v. Duckworth*, 772 F.2d 1410, 1421–22 (7th Cir. 1985) (en banc) (concurring opinion). This means "actual prejudice" (*Lane, supra*, 106 S.Ct. at 732), a significant likelihood of altering the verdict. Under that test the prosecutor's misconduct in this case is harmless.

The standard of "harmlessness" has never been a unitary one. It varies with the nature of the underlying right, the time of the violation, the tools available to correct the violation at trial, and the number of layers of review. (1) Constitutional rules

---

1. See *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368; *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705.

2. District Court order reproduced in petitioner's App. A p. 3.

3. The instruction was "to ignore the last question, for the time being" unless the judge's checking while Miller was on the witness stand on cross-examination showed that the prosecutor's question was permissible (petitioner's App. A p. 2). Since the judge did not so find, the instruction remained in effect and was augmented by the fourth instruction to the jury upon the completion of the closing arguments.

1. Even under *Chapman* there is a good argument that the error is harmless, as six Justices of the Supreme Court of Illinois held (see 96

Ill.2d 385, 70 Ill.Dec. 849, 450 N.E.2d 322) and as Chief Judge Cummings concludes. The trial lasted nine days; the offending question was a brief interlude. The court sustained an objection to the question, and the prosecutor never got to argue to the jury the inference it should draw from silence. The court told the jury at the end of the case to ignore all questions to which objections had been sustained. Doubtless the judge would have been more explicit had Miller's counsel asked for more. Counsel did not ask the judge to elaborate, perhaps concluding that it would be counterproductive to focus the jury's attention on this. The evidence in this case did not admit of one conclusion only, but neither did the evidence in *Phelps v. Duckworth*, 772 F.2d 1410 (7th Cir.1985) (en banc), in which we found a similar frustrated prosecutorial effort to have been harmless.

that promote the accuracy of the truth-finding process, that protect the innocent, are enforced strictly. "Prophylactic" rules designed to achieve collateral objectives need not be enforced in every case or at any cost. *Doyle* is a prophylactic rather than innocence-protecting rule. (2) Constitutional rules are enforced more strictly on direct review than on collateral review. Some rules are not enforced at all on collateral review. This case is a collateral attack, and the state courts gave full and fair consideration to Miller's constitutional claim. (3) When the violation is one that may be prevented or corrected at trial, but because of the neglect of defense counsel is not, courts are less willing to enforce the rule strictly. Strict enforcement weakens the incentives to do things right the first time. The *Doyle* error in this case could have been corrected at trial more fully than it was, had Miller's counsel but asked. (4) When the violation is prosecutorial misconduct during the trial, collateral review is limited to determining whether the trial is fundamentally fair. The prosecutor's effort to use Miller's silence was cut short by the judge, and we are left with prosecutorial misconduct rather than a completed *Doyle* violation. We are concerned with the adequacy of the remedy, not the identification of the wrong. All of these considerations suggest that *Chapman* is the wrong standard, for it stacks the deck against the verdict of the jury. I elaborate below on each of the four.

1. *Doyle* holds that the due process clause of the fourteenth amendment forbids the use as evidence of a suspect's silence after he has received the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See *Wainwright v. Greenfield,* —— U.S.

——, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). This is not because silence will mislead the jury or cause it to convict an innocent person. To the contrary, innocent people with plausible explanations tend to give them promptly, in order to achieve release. Silence at the time of arrest, followed by an exculpatory story at trial, is evidence of guilt. *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982); *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). Cf. *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). Some language of *Doyle* suggests that silence is "insolubly ambiguous," but cases such as *Fletcher* and *Jenkins,* which allow the jury to hear evidence of silence that precedes *Miranda* warnings, abandon this strand of *Doyle's* reasoning. See also *Greenfield, supra,* 106 S.Ct. at 639 n.6, 640 & n.12.

The rule of *Doyle* therefore rests exclusively on the vice of the double-cross. Defendants ought not to be bushwhacked if they rely on the advice implicit in *Miranda* warnings that the exercise of the right to remain silent will not come back to haunt them. *See Greenfield, supra,* 106 S.Ct. at 639–41; *Dean v. Young,* 777 F.2d 1239, 1241–42 (7th Cir.1985). *Miranda* warnings are not parts of the constitution. They are designed to reduce the likelihood of subtle coercion of people in custody. *Oregon v. Elstad,* —— U.S. ——, 105 S.Ct. 1285, 1291–93, 84 L.Ed.2d 222 (1985); *Michigan v. Tucker,* 417 U.S. 433, 442–46, 94 S.Ct. 2357, 2362–64, 41 L.Ed.2d 182 (1974). *Doyle* is therefore a prophylactic rule designed to increase the efficacy of another prophylactic rule. It has nothing to do with the defendant's guilt and everything to do with insisting that the government play straight with those it prosecutes.[2]

---

**2.** "Playing straight" is a valuable objective, but it does not always prohibit a change of heart. Consider *Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), holding that a prosecutor may withdraw an offer of an advantageous plea bargain. Consider the holding that a confession obtained after the deceit of a suspect's lawyer is nonetheless admissible. *Moran v. Burbine,* —— U.S. ——, ——, ——, 106 S.Ct. 1135, 1142, 1146, 89 L.Ed.2d 410 (1986). Or consider the many defendants prosecuted for carrying out a President's instructions. See the three distinct positions expressed in *United States v. Barker,* 546 F.2d 940 (D.C. Cir.1976). The legal system has never tried to make all promises of governmental agents perfectly believable or enforceable. E.g., *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *United States v. Caceres,* 440 U.S. 741, 99

Because a violation of the rule of *Doyle* does not threaten the conviction of an innocent person, it is not essential to achieve perfect compliance. New trials are costly. They take the time courts and prosecutors could devote to affording first trials to other people. They increase the risk of error; trials long after the event, when memories have faded, are less likely to be accurate. And no one can guarantee that the second trial will be better than the first. There will be new opportunities for new errors, which may be as bad as the error in Miller's trial. The enforcement of prophylactic rules is a matter of costs and benefits. Such rules should be enforced only so long as the benefits exceed the costs. See Thomas W. Merrill, *The Common Law Powers of the Federal Courts*, 52 U.Chi.L.Rev. 1, 53 (1985).

The two best-known prophylactic rules of the criminal law offer examples in abundance. The exclusionary rule under the fourth amendment and *Miranda* are both prophylactic rules, a "constitutional common law." Henry P. Monaghan, *The Supreme Court, 1974 Term—Foreword: Constitutional Common Law*, 89 Harv.L. Rev. 1 (1975); Merrill, *supra*, 52 U.Chi.L. Rev. at 54–59. The use of illegally seized evidence is not itself a violation of the constitution and does not increase the risk of convicting the innocent. The exclusionary rule is designed to influence the conduct of police by denying them some of the benefits of their misconduct. Yet because at some point the costs of influencing the police in this way begin to exceed the marginal benefits, the Court has given the exclusionary rule less than its largest possible scope. See *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 3418–22, 82 L.Ed.2d 677 (1984) (discussing both the nature and the rationale of the limits on enforcement). The rule prevents the government from using most (though not all) illegally seized evidence in the prosecutor's case in chief against the person whose privacy has been invaded, but it does not prevent the use of such evidence during cross-examination to impeach exculpatory testimony. Exclusion in such circumstances would simply offer shelter for perjury without significantly increasing the deterrent value of the rule. *United States v. Havens*, 446 U.S. 620 (1980).

Cases in the *Miranda* line also balance the gains from more rigorous enforcement against the costs. This has led to holdings that allow substantial use of the "fruits" of violations of *Miranda* (see *Elstad* and *Tucker, supra* ) and that allow statements obtained in violation of *Miranda* to be used to impeach defendants who proclaim their innocence on the stand. *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). See also *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (statements obtained in violation of *Miranda* may be used when the "public safety" made it advisable for the police to disregard *Miranda* ). Even cases dealing with evidence obtained in violation of the sixth amendment's right to counsel explicitly balance costs and benefits. *Maine v. Moulton*, —— U.S. ——, 106 S.Ct. 477, 489–90, 88 L.Ed.2d 481 (1985).

Selecting a standard for assessing harmless error, no less than deciding when the prosecutor can use evidence the constitution says he should not have at all, requires an assessment of the marginal benefits and costs of additional enforcement. See *United States v. Mechanik*, —— U.S. ——, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), in which the court uses just such an analysis to select a harmless error rule for violation of the rules concerning conduct before a grand jury. How much enforcement of the rule of *Doyle* is enough? *Doyle* is a descendent of *Miranda,* which suggests that perfect enforcement is not to be achieved at great cost. It is not concerned with protecting the innocent. The difference between a *Chapman* standard of review and a *Kot-*

S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. Medico Industries, Inc.*, 784 F.2d 840, 845–46 (7th Cir.). The questions are how much enforce-

ment, at what cost, for whose benefit? But I need not pursue the matter.

*teakos* standard is not likely to weaken the effective enforcement of *Doyle;* no matter what standard of harmless error a court uses, the substantive rule informs judges how they must respond to the prosecutors' efforts and informs prosecutors that an effort to draw the jury's attention to the defendant's silence reduces the chance of conviction. These two messages, which are unaffected by the selection of a standard of harmless error, are the principal advantages of the rule. When the rule is as far removed from protecting the innocent as is *Doyle,* there is no need for the strict enforcement that the *Chapman* standard creates.

Indeed, the application of *Doyle* when the prosecutor uses the defendant's silence to impeach his exculpatory testimony (as the prosecutor did in Miller's trial) is anomalous. *Harris* and *Hass* hold that evidence obtained in violation of *Miranda* may be used to impeach, lest the defendant conclude that perjury will go unpunished. A use of silence condemned by *Doyle,* as another way to violate *Miranda,* should be treated the same way. Now *Doyle* itself involved silence used to impeach, but as I have explained *Doyle* initially rested on two lines of argument: the vice of prosecutorial contradiction and the "insoluble ambiguity" of silence. The latter stand suggested that *Doyle* protected rather than undermined the search for truth. This line of justification was abandoned in *Greenfield, Jenkins,* and *Fletcher.* The only case other than *Doyle* in which the Supreme Court has held that evidence of silence at the time of arrest must be excluded is *Greenfield.* In *Greenfield* the prosecutor used the silence as part of the state's case in chief. The Court then added this suggestive language: "At the outset, we

note that, in this case, unlike *Doyle* and its progeny, the silence was used as affirmative proof in the case in chief, not as impeachment", to which it added this footnote: "The constitutional violation [in *Greenfield*] thus might be especially egregious because, unlike *Doyle,* there was no risk 'that exclusion of the evidence [would] merely provide a shield for perjury.' 426 U.S., at 626, [96 S.Ct. at 2248] (STEVENS, J., dissenting)." 106 S.Ct. at 639 & n.8. This may be too thin a foundation on which to build a conclusion that the prosecutor may ask the sort of question that the prosecutor did in this case. At a minimum, however, it shows that some violations of *Doyle* are more serious than others.

The sort of violation in this case is among the least serious, not only because it occurred during cross-examination but also because the court sustained an objection, on which more below. The less serious the offense, the less the state must do to rectify things. All of this calls for a standard of harmless error more tolerant than that of *Chapman.* The Supreme Court has never discussed the standard of harmless error that applies to a violation of *Doyle's* rule.[3] The choice is ours to make, and we should make it with reference to the kind of rule *Doyle* is and the costs and benefits of stricter enforcement, not by a mechanical invocation of *Chapman.*

2. This is a collateral attack on a criminal judgment. The comment on Miller's silence may have violated the constitution, but it takes a stretch to say that Miller's "custody" violates the constitution, which is the standard of 28 U.S.C. § 2254(a). Not all violations of the constitution turn the resulting "custody" into a violation. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), holds that violations of

---

**3.** The parties in *Greenfield* did not present any issue concerning harmless error. 106 S.Ct. at 640 n.13. None of the earlier cases in this line discusses the question. Justice Rehnquist, concurring in *Greenfield,* observed that "the State does not argue here that any error was harmless beyond a reasonable doubt", 106 S.Ct. at 641, and went on to volunteer that even though the prosecutor argued inferences from silence during his closing argument (which did not happen

here) "the brevity of the prosecutor's comment, at least suggests that the error was harmless beyond a reasonable doubt", 106 S.Ct. at 644. It is fanciful to find in this aside a conclusion that "reasonable doubt" is the *right* standard to use. The parties had not argued *any* standard of harmless error, and perforce they had not debated (and Justice Rehnquist had not focused attention on) *which* standard is the right one.

the fourth amendment do not permit a court to set aside the conviction under § 2254(a) unless the state has failed to supply a full and fair opportunity for adjudicating the claim of violation. If the state supplies the necessary process, that vindicates the principles underlying the exclusionary rule; there is no need for the more complete protection that collateral review would produce.

This restriction of collateral review is but another demonstration that there can be too much of a good thing. It is costly to enforce any constitutional rule, and the "full treatment" should be reserved for rules designed to protect the innocent from improper conviction. See Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi. L.Rev. 142 (1970). See also Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L.Rev. 441 (1963). If state courts rigorously enforce a constitutional rule, that should be sufficient without the need for a second tier of review—certainly so if the rule is unrelated to the proper ascertainment of guilt. A federal court properly may insist that the state offer a full and fair opportunity to litigate. If the state does this the grant of release on collateral attack is more likely to come as a stroke of lightning (and so not influence state policy), or even to reverse a correct decision of the state court, than to be an essential prop under the constitutional right. Cf. *Vasquez v. Hillery*, —— U.S. ——, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), at 625 (O'Connor, J., concurring), 628–34 (Powell, J., dissenting).

The Court has yet to decide whether *Stone v. Powell* applies to cases in the *Miranda* sequence. See *Nix v. Williams*, 467 U.S. 481, 104 S.Ct. 2501, 2512 n. 7, 81 L.Ed.2d 377 (1984). So there is no simple answer to the question whether *Doyle*, a derivative, should be enforced on collateral attack.[4] We cannot answer this by pointing out, as the majority observes, that a *Doyle* violation "is constitutional and personal to the petitioner." Slip op. 14. Violations of the fourth amendment, too, are constitutional wrongs, and unless the wrong was "personal to" the defendant, the exclusionary rule does not apply even on direct review. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The question is one of remedies on collateral attack, not of who was injured by the violation. But we need not pose the question as a choice between nonenforcement and full enforcement (meaning application of the *Chapman* standard). There is a middle ground. Some rights are enforceable on collateral attack, but only if the violation and injury are especially severe.

For example, a violation of Fed.R.Crim.P. 11, which establishes procedures for taking guilty pleas, is enforceable on direct appeal by almost automatic reversal. *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). On collateral attack, however, Rule 11 is enforceable only to the extent that the disregard of its provisions makes the proceedings fundamentally unfair. *United States v. Timmreck*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). The difference is not attributable to the nonconstitutional status of Rule 11, for the Rule is a "law," and the pertinent statute, 28 U.S.C. § 2255, allows collateral attack on the ground that a person is in custody "in violation of the Constitution or laws of the United States". See *Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). The change in the standard of review instead rests on the conclusion that for Rule 11, as for many other things, one round of review is sufficient unless something has gone very wrong indeed. See *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962); *Sunal v. Large*, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947). The same may be said for review

---

4. Our court has held that *Doyle* and *Miranda* claims will be entertained on collateral attack. *White v. Finkbeiner*, 687 F.2d 885 (7th Cir.1982) *vacated on other grounds*, 465 U.S. 1075, 104 S.Ct. 1433, 79 L.Ed.2d 756 (1984). See also *Morgan v. Hall*, 569 F.2d 1161, 1168–69 (1st Cir.1978).

of state convictions. See *Henderson v. Kibbe*, 431 U.S. 145, 154 & n.13, 97 S.Ct. 1730, 1737 & n. 13, 52 L.Ed.2d 203 (1977), which holds that only in the rarest of cases will an instruction to which no objection was made at trial support collateral attack, even though the same instruction might have been "plain error" on direct appeal. All of these distinctions implement the principle that more enforcement of constitutional rights is not always required. If *Doyle* errors may be raised on collateral attack at all, "enough" enforcement will be achieved by application of the *Kotteakos* standard.

*Chapman* itself was a direct appeal, and the underlying right was designed to prevent juries from drawing unjustified inferences of guilt from the invocation of the privilege against self-incrimination. The Supreme Court has never explicitly considered when the *Chapman* standard should be applied in cases that are marginally (if at all) appropriate for collateral review. Cases such as *Henderson v. Kibbe* support the use of a graduated standard of review, and we ought not await a formal command from the Supreme Court that graduation is the norm.

3. One trial should be enough. In order to make one trial sufficient, it is necessary to ensure that counsel have the right incentives to marshall their resources for a single, correct presentation. It is also necessary to ensure that if something should go wrong, counsel have reason to correct whatever is correctable rather than sit by and store up error. Contemporaneous objection rules, and the forfeiture of collateral attack in the absence of such objections, help induce counsel to take care at trial. See *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *United States ex rel. Spurlark v. Wolff*, 699 F.2d 354 (7th Cir.1983) (en banc).

The fact that some errors can be prevented or cured during the trial has led not only to preclusion of review, as in *Sykes*, but also to redefinitions of the right. We say that the defendant has a right to exclude hearsay if he objects, not that any use of hearsay is error. This is so for constitutional rights as well. The defendant starts with a presumption of innocence, and the Court has held that this implies a right not to be tried in jail garb. *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The defendant must assert this right to claim it, however; if he does not object, he may not later complain. The rationale for this, and for other cases insisting that the defendant take an active part in the vindication of his rights, is that every participant in the trial should help to reduce the incidence of error. Errors that affect the operation of the trial may and should be prevented or cured; there is joint responsibility.

True, counsel for the defendant may be snoozing. But drowsiness is yet another preventable problem, and the errors of counsel will be overlooked unless they were so substantial that they probably change the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hill v. Lockhart*, — U.S. —, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985). The Court treats the effect of error on the trial as part of the definition of the right, because perfect representation is unlikely and it would be too costly to keep rerunning trials until things finally were done at a very high level of care. *Chapman* vanishes as a standard in ineffective assistance cases. Gross errors of counsel will not lead to relief, even though a court could not find the error harmless beyond a reasonable doubt.

Where does this lead us? It means that errors within the power of counsel to correct at trial should not be assessed under the *Chapman* standard. Errors counsel should correct, counsel must correct. If counsel fails to do what is necessary (say, to object to the use of jail garb), that diminishes or eliminates review of the mistake. The case transmutes to an inquiry into the overall efficacy of counsel. If this is an isolated problem, there will be no relief; if counsel was seriously deficient

and this calls into question the accuracy of the verdict, then there may be relief. It is silly to review each correctable error under the stringent *Chapman* standard and yet to review counsel's failure to prevent or correct these errors under a standard even looser than that of *Kotteakos*.

Miller's counsel could not have prevented the prosecutor's initial question, but counsel could have done more to deal with that question. Counsel objected; the court sustained the objection; that was the end. After discussing matters with counsel, the court told the jury to "ignore that last question for the time being." The majority finds this "too ambiguous" (slip op. 447) to overcome the implication in the prosecutor's sally. When *was* the jury to consider the question? During deliberations? The majority says that only "a clear, immediate, and unambiguous cautionary instruction can be sufficient to cure a *Doyle* violation." *Ibid.*

But a paltry or confusing instruction to the jury may have been what Miller's lawyer wanted. He could have asked for a stronger instruction during the conference held before the court gave this feeble one; he did not. Counsel could have asked for more, at once; he did not. Counsel could have asked for more when the judge gave the instructions at the end of the case; he did not. Counsel could have argued the point during his own closing argument; he did not. All of these courses carry risks. Perhaps Miller's counsel thought that the prosecutor's abortive inquiry had not affected the jury. In that event it may have been sound strategy to leave things without further comment. Counsel may have concluded that the more the judge said, the more the jury would think about the fact that Miller was silent when arrested. Cf. *Lakeside v. Oregon,* 435 U.S. 333, 345–48, 98 S.Ct. 1091, 1097–99, 55 L.Ed.2d 319 (1978) (Stevens, J., dissenting). Perhaps the risks of correction are so high that we should deem the judge's curative instruction irrelevant. But if cure is possible, cf. *Parker v. Randolph,* 442 U.S. 62, 69–75, 99 S.Ct. 2132, 2137–40, 60 L.Ed.2d 713 (1979), then counsel's performance matters.

If counsel made a strategic decision not to ask the judge to give the sort of instruction the majority says was missing—to tell the jury that Miller had a right to remain silent and that the jury should not infer anything from the exercise of that right— then there is no basis for setting aside the conviction. A federal court ought not insist that the judge give instructions that defense counsel did not want. If, on the other hand, Miller's lawyer was asleep on his feet and did not ask for an instruction or clarification that would have helped his client, then this case should be assessed under the standards of *Strickland,* and the verdict should be preserved unless Miller shows that his counsel's neglect likely affected the outcome. Whether counsel was awake or asleep, tactical genius or blunderer, there is no reason to apply the standard of *Chapman* to the failure of counsel to ask (or the judge to volunteer) a better curative instruction.

4. The problem in Miller's case is one of prosecutorial misconduct, not judicial error. The prosecutor set off on a forbidden path. Before he could get past the first question, he was cut off by the judge, who correctly sustained an objection. If the court had allowed the questioning to continue or had allowed the prosecutor to argue to the jury that it should infer guilt from silence, we would have a completed violation, as there was a completed violation in *Chapman.*

The Court assesses prosecutorial misconduct under standards less stringent than that of *Chapman.* For example, in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), the prosecutor offered a personal opinion that the defendant was guilty and insinuated that defense counsel were seeking a conviction on reduced charges rather than an acquittal. This was serious misconduct, yet the Court held that the misconduct could support relief on collateral attack only if it so undercut the fairness of the entire trial that the trial violated the due process clause. Similarly, in *United States v. Young,* — U.S. —, 105 S.Ct. 1038, 34

L.Ed.2d 1 (1985), a case on direct appeal, the Court applied the *Kotteakos* standard to prosecutorial misconduct in closing argument.

It could be said that these cases simply exclude particular instances of prosecutorial misconduct from the category of "violations of due process" and therefore do not affect the harmless error rule that applies to "real" violations. Perhaps so, as the majority concludes, although this is an artificial distinction. There is no analytical difference between saying "prosecutorial misconduct does not violate the due process clause unless it is sufficient to call for a new trial under *Kotteakos*" and saying "prosecutorial misconduct is fundamentally unfair and violates the due process clause, but it leads to a new trial only if it meets the standards of *Kotteakos*."

At all events, the argument that there is a clear separation between the definition of "unconstitutional misconduct" and the selection of the standard of review no longer carries the day. *United States v. Bagley*, — U.S. —, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), is a good example. The constitution requires the prosecutor to deliver material, exculpatory evidence to the defense. This is a duty; it does not depend on the prosecutor's state of mind. *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). One could say that if the prosecutor violates this duty, then the conviction must be set aside unless the violation is harmless under *Chapman*. The Court has taken a different approach. Unless the prosecutor suborns perjury or refuses to supply exculpatory material that he knows is material, the conviction will be sustained unless the de-

fendant shows that the withheld information "undermines confidence in the outcome of the trial." *Bagley, supra,* 105 S.Ct. at 3381. Here we have a case of constitutional error[5]—more, constitutional error that could lead to the conviction of an innocent person—in which the Court puts on the defendant the burden of showing a probable effect on the outcome. This is review under a standard even less searching than *Kotteakos,* which assigns the burden to the prosecutor. *Bagley* merges the standard of review with the definition of the violation. So *Chapman* does not apply to all violations of the constitution.[6] It never did, and when the violation is prosecutorial misconduct, the Court is apt to apply an exceptionally loose standard of error.

5. All of this is reinforced by the fact that we must assess the state court's selection of a remedy for the wrong done to Miller. The state court gave a curative instruction. *Morris v. Mathews,* — U.S. —, 106 S.Ct. 1032, 89 L.Ed.2d 187 (1986), suggests that the *Chapman* standard does not apply to disputes about the adequacy of remedies. *Morris* held that a court may cure a violation of the double jeopardy clause by substituting a conviction on an offense not barred by the clause, unless "the defendant shows a reliable inference of prejudice." 106 S.Ct. at 1038. Four Justices would have used the *Chapman* standard, see *id.* at 1040–43 (Blackmun & Powell, JJ., concurring), 1044 (Brennan, J., dissenting), 1044–45 (Marshall, J., dissenting). *Morris* presented a question about how to cope with a constitutional error. The state coped by substituting a conviction on a lesser crime. The Court held it appropriate to require the defendant to

---

**5.** The majority properly points out that *Bagley* said that "suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial." 105 S.Ct. at 3381. This merges the standard of harmless error into the definition of the violation. But other passages in *Bagley*—and the unanimous judgment of the chain of cases leading to *Bagley*—show that the Court treated any withholding as a "violation" without regard to the effect on fairness of the trial. Material exculpatory evidence must be disclosed because it might affect the

outcome; the failure to disclose leads to reversal only if the fears have been realized. For this reason *Donnelly, supra,* distinguished the misconduct at issue there from the constitutional violation of withholding material exculpatory evidence.

**6.** The Justices who dissented in *Bagley* argued that the Court should apply the *Chapman* standard. See 105 S.Ct. at 3391, 3395 (Marshall, J., joined by Brennan, J.).

show that the state's remedial device was insufficient to cure the constitutional error. This is not *Chapman*'s allocation of burdens. Perhaps *Morris* is limited to double jeopardy cases, but it could also be read to establish a general rule that the defendant must bear the burden of showing that despite the state's remedial device "the result of the proceeding probably would have been different" (*id.* at ——, U.S. at ——, 106 S.Ct. at 1038) had there been no error. This fact-bound inquiry is an appropriate subject of deference under 28 U.S.C. § 2254(d), albeit not preclusion. Cf. *Miller v. Fenton*, —— U.S. ——, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

---

I recognize that all of this has the makings of a bad stew. A cup of analogy to the exclusionary rule, four oz. of *Harris v. New York*, a slice of *Stone v. Powell*, a dollop of *Wainwright v. Sykes*, all seasoned by *Donnelly v. DeChristoforo* and *Strickland v. Washington*. Why scramble due process, the fourth amendment, restrictions on the scope of the substantive rule, preclusion of review, ineffective assistance of counsel, and other doctrines? Why not keep things straight?

It is tempting to sort these cases into little boxes and dismiss each as irrelevant to *Chapman*. But these principles are not so easy to confine. *Bagley*, a prosecutorial misconduct case, adopts the standard of *Strickland v. Washington*, an assistance of counsel case, which was in turn influenced by *Wainwright v. Sykes*, a forfeiture case. *Morris* merges questions of error with questions of remedy. These cases all reflect an underlying concern that collateral review of criminal convictions is very costly, a conclusion that the search for perfect justice must stop well short. The standards for determining harmless error, just like the rules of forfeiture and the scope of the exclusionary rule, must be based on an appreciation of the benefits and costs of "better" enforcement of the substantive rules of law.

It is both tempting and wrong to treat "error" as a dichotomous phenomenon, as a matter of yes or no. There is error or not; the kind of error is reviewable on collateral review or not; this claim of error was forfeited or not; the error is harmless beyond a reasonable doubt or not; so the chain of questions and answers goes. Yet the definition of error, the scope of review on collateral attack, the circumstances under which review is forfeited, and the appropriate standard of harmless error have common influences. It is better to consider all of these together—however untidy the result may be—than to enforce an artificial separation. The definition of error, the scope of review, and the standard for assessing harmlessness all have shadings rather than simple, dichotomous answers.

The treatment of such questions as binary may produce unpleasant results. A court convinced that certain constitutional rights are not all that important may be tempted to cut down the scope of the right or to preclude review altogether, if these are the only alternatives to review under the *Chapman* standard. Alterations in the rules for determining harmless error may permit a court to enforce the rules of forfeiture less harshly. The interactions work in many directions.

Still, what conclusion comes from all of this? That *Doyle* should not be enforced on collateral review? That the standards of harmless error should differ on direct and collateral review? That the defendant must show that the prosecutor's misconduct probably changed the result of the trial? That *Kotteakos* is the right standard of harmless error? None of these flows ineluctably from the discussion. But I also need not choose. The majority applies the most stringent standard (*Chapman*), on collateral review, to the prosecutor's foiled effort to violate a prophylactic rule. We needn't know the right analysis to know that *Chapman* should not be used. The application of the *Kotteakos* standard here yields a conclusion that the judgment of the state court should stand. It is neither wise nor necessary for a federal court to review with greater rigor the state's

decision that the violation of the rule of *Doyle* in this case was harmless.